and ABB, Inc. Mr. Bond, I understand that you have reserved two minutes of your time for rebuttal? Yes, Your Honor. Okay, you may proceed, sir. Thank you. Good morning and may it please the Court. Hyundai raised four issues in its case brief. First, the DSC's service-related revenue, SRR, documents related to SRR, the reporting of revenues for a part, and the use of total adverse facts available. I'm going to discuss the first two issues. With the argument, why don't you start with the issue, the argument that you think is most important to your case? Thank you, Your Honor. That's where I'm heading. I think with respect to the first two issues, this case ultimately turns on the concept of reliance. In our view, the record clearly shows that Hyundai was reasonable in relying on the Department of SRR that the Department had used previously. It had previously used a particular definition in three proceedings for the term. The term is not defined in the statute or the regulations, nor was it defined in the questionnaire that Hyundai was asking for. Mr. Bond, is commerce required to rely on the investigatory steps it took in prior annual reviews? Well, I think, Your Honor, it's not a simple yes or no answer. First of all, the circumstances in this review were such that the exact same evidence was at issue in POR3 as in POR2. Some of it was legal issue was being considered, and the decision that was made in POR2 overlapped with the reporting in POR3. Under those circumstances, we think that the Department's practice was very relevant to, number one, the approach Hyundai took in responding to questions in POR3, as well as the Department's claim that they weren't cooperative in relying on that definition. In conducting the third administrator review, you're saying, you're arguing that commerce had to or was obligated somehow to proceed on the same basis it did in the prior reviews. No, I would say it differently, Your Honor. I would say that the Department of Commerce was certainly free if it chose to take a different route to do so. But where Hyundai was very clear in its reliance on what the Department had previously said, the Department had an obligation, a high obligation, to tell Hyundai that those previous decisions were relevant. Let's assume that in the fourth administrator review that commerce, through verification, determines that it needs to take a different approach or ask for information in a different form. Is it permitted to do so? Yes, as long as it makes the nature of the request clear. As long as it makes clear that it's asking for something different than what it had previously required or accepted. Our point, Your Honor, is not that commerce is fixed, but it must always take the same approach. The point is that where it's routinely, regularly taken the same approach and based on the same evidence, it has an obligation to notify a respondent that it intends to make a change and that it's asking for something different. Mr. Bond, this is Judge Chen talking. I saw in your brief and then also you said at the beginning of your oral argument that commerce had provided a particular definition of service-related revenue, and I just couldn't find that in the record. Could you point me where commerce prior to AR-3 had said, here's our definition of service-related revenue that we're going to be using? I'll have to get you the appendix, Your Honor, but in the memorandum to the original investigation in PLR-2, the Commerce Department made very clear that the definition, which we call the ADB definition, based on just whether there happened to be revenue on a particular document was something that it had considered and was rejecting. Mr. Bond, in the previous definition, whether or not the services were separately invoiced as opposed to being rolled into the total cost? No, I think that's the issue, Your Honor. The previous definition focused on whether the respondent here, Hyundai, was required to provide the services under the terms of sale of the merchandise. It did not turn simply on whether there happened to be some itemized revenue on a document. And so in the documents from PLR-3 that were also on the record for PLR-2, there is plainly separate revenue broken out. The problem, the question is that under the previous definition that was applied, that would not indicate that Hyundai had separate revenue to report because those services were being provided in conforming with the terms of sale. My understanding was that the documents in PLR-2 and 3 were the same, that the ADB blew the whistle in Review Number 3 and pointed out the fact that those documents, even in 2, showed the possibility of independent stream of revenue and the independent billing of the services. And that it was ADB blowing the whistle that caused Commerce to raise its eyes, look at the situation, and then obviously agree with ADB by coming back to you after your first refusal to give over the document for independent service, came back to you and said, now we really want it. And then when you didn't give it the second time, they came back the third time and said, we want that information. Yeah, Your Honor, I would say that that is not consistent with what occurred and it's not consistent with our presentation in our papers. What ADB did in PLR-2 was, I'm sorry? Well, I think that's going to be the government's argument, at least that's how I understood it from the government in ADB, was that their position was that in 3rd Review, the specific question of whether or not there was an independent income stream for services, meaning that there was a question as to what the total product cost was, that that was evidenced by the documents, even though the documents had been present as well in Review 2. So if that much I'm saying is factual, then you have to explain why it was dirty, plural, or unfair, or wrong for Commerce to want in Review No. 3 to find out the extent to which there had been separate billing on services. Your point, Your Honor, your point, I believe, works to support our argument. The documents that we're talking about that show the separate revenue, which ADB placed on the record for PLR-3, were also on the record for PLR-2 and ADB brought those documents to the Department of Commerce. Well, I'm not sure what you mean by blow the whistle. They specifically asked the Department of Commerce to review the documents at the verification of PLR-2, which the Commerce Department did, and it still found that there was no service-related revenue. Well, Mr. Bond, in the course of that verification, it seems to me that's where ADB acquired documents that showed that Hyundai could, in fact, separate the service-related cost or revenue from its U.S. price. That's where it blew the whistle. Well, again, I'm not sure what you mean by blew the whistle. Prior to the verification of PLR-2, many of these documents were... By blowing the whistle, I mean that it challenged Hyundai's assertion that it did not have the revenue related to services from its U.S. price. Correct. And ADB made that claim prior to the verification of PLR-2, which is why the department specifically considered it at the verification of PLR-2. Tell me if I'm wrong, but it seems that during the third review that ADB acquired the verification documents that showed that Hyundai, in fact, was able and had been separating the service-related revenue stream from its U.S. price in the quotes it was given to U.S. customers. That's the blowing the whistle part. If I could clarify two points, please. First, Your Honor, the documents with the separate revenue that we're referring to as whistleblowing documents, those documents were on the record prior to the verification of PLR-2. ADB was aware of those documents, many of them, and they specifically asked Commerce to look at this particular issue with respect to those documents at the PLR-2 verification. And despite that, after having done so... Mr. Bond? Yes, Your Honor. Mr. Bond, Mr. Clavenger, when I meant by whistleblowing, I suppose I chose the wrong words. What I meant was focus attention on. I understand, Your Honor. The question, as I understood it, the question was whether Hyundai was capable of separating out service charges from the other charges. That specific question wasn't raised in Number 2. That's my point. If the question was raised, then it was considered in PLR-2. In Number 2, there wasn't any focus of attention on this issue. I'm saying in Review Number 2, there was no focus of attention created either by ADB or Commerce on the question that the presiding judge has nicely phrased, which was whether your client was capable of separating out that service income. So that was just a non-issue in Number 2. It becomes an issue in Number 3. So you have to prove to us that it was illegal for Commerce to raise that issue in Number 3 in order for you to prevail, I believe. And I hear you talking around the circle, not coming directly to the question, and I believe the presiding judge was asking the same question more sharply than I have, which was, why couldn't Commerce, once it focused its attention on documents that it had seen before but on which it had not focused, why couldn't it ask the questions it was asking? Your Honor, I think there's a misconception of what Commerce did during PLR-2 and therefore the relevance of its decision in PLR-2 to PLR-3. In PLR-2, Commerce, based on the same documents, paid a lot of attention to this issue. This wasn't a new issue in PLR-3. In particular, in PLR-2, the Commerce Department said, quote, a review of sales documents on the record, including the sales traces reviewed at verification, showed no indication that Hyundai improperly reported sales data. None of these expenses were inconsistent with the terms of sale. So the idea that the Commerce Department discovered this issue based on statements of ABB for the first time in PLR-3 is false. This was a live issue beginning with the original investigation, and despite that, the Commerce Department agreed with Hyundai. Okay. Accepting your argument, then, how is it that you can claim some sort of surprise in PLR-3? Well, I think this is... How is it that you can claim that you would... I'm sorry? Did you say something? No, no. I started, too, but please finish your question. I'm sorry. Well, thank you. How is it that you can say that you were relying on PLR-2 in reporting in PLR-3 when this was a live question during the second administrative review? Shouldn't that have alerted you to gather the data and to check your information going into the third administrative review? Well, in PLR-3, Your Honor, first of all, we were responding at the time of the original questionnaire to essentially the exact same question we've responded to in the previous segments of the proceeding. And so in doing that, we think reasonably relied on the Commerce Department's repeated statements that our approach was correct and ABB's approach was incorrect. Subsequently, between the original response and the supplemental response, the Commerce Department issued its final decision in PLR-2 where, once again, it concluded that our approach was correct and ABB's was incorrect. So not surprisingly, we followed that approach again in responding to the supplemental questionnaire. Mr. Bond, did you ever find in the record Commerce's proclaimed definition for what SRR means? The definitions on the record come from, as I say, the memos from... I know. We were talking about this before, how you're saying you relied on their definitions. And I just am looking for a page, a pinpoint, a line where I can read, where I can see where Commerce said, here's our definition of SRR for purposes of this case. I mean, this is your argument. You argued that they had an express definition that you relied to your detriment. And so I just want to see what that definition actually reads as. Your Honor, we described it... Do you have a cite? Appendix 51-20-23, citing to the IDM. I'm sorry, could you repeat that? We described it as Appendix 51-20-23, citing to the Department of IDM. What document is this? 51-20? It's in our questionnaire responses, Your Honor. In our questionnaire responses, we were in turn citing to the decision memoranda of the Commerce Department from the previous segments of the case. Appendix 51-20, I have the record open. Can you point from the main language in the record what you're talking about? Because you're citing three pages. Where is the definition in the three pages? Your Honor. These are questions and answers. These are answers that you're giving to Commerce, I believe. Correct. I think perhaps one of the most relevant... Where in your answer do you define, do you say, here's how Commerce has defined the term? I got the record open. 51-21, Your Honor. About how far down in the page? Let me read it to you. Perhaps it would be the easiest. Quote, the department recognized... I'm sorry, could you tell us where on the page you're reading from? I'm pulling the document, Your Honor. While he's pulling the document, Michael, am I correct that I heard the term... I think the sentence to which the counsel is referring is about 40% down in the page on the page. The department recognized that its practices separate revenue and expenses, quote, that are not included in the term of sale, period, close quote. Correct, Your Honor. And as support for that, we've cited to... And how is that a definition of services? At the... During the original investigation in this case, and since then, there were two operative potential definitions of service-related revenue. As I say, it's not defined in the statute, the regulations, or the questionnaire. One option, which is the option that Ande had followed, was that service-related revenue existed if someone was performing a service that it wasn't required to perform under the terms of sale. That was the approach that Commerce had adopted and accepted. The second approach, which was ADB's proposal, was that service-related revenue existed wherever there was a separate amount of money that appeared on the sales document. And so, the tension here is that on certain sales documents, there are revenues for separate services, but those services were being performed in accordance with the terms of sale. And so, Ande... How would you know whether or not they were included in the terms of the sale or not? If all you had was a document that showed you that there's a line item for service, and then there's a line item for the equipment, and that's what the record shows of these invoices that I looked at, and they were in both three and two and three. So, how do you know, unless you read the underlying contract, how do you know whether the cost... You don't. You need to review the contract... And if I'm not mistaken, Commerce was asking for those documents so it could determine whether or not the definition was met. Right. So, first of all... I don't see how Commerce is changing the definition. They're pointing out the invoices that show separate sums for service as opposed to the hardware. And ABB, Commerce say, well, that's okay, provided that the terms of sale provides for the bundling of the two. Your Honor, it seems pretty clear that the Commerce Department changed the definition because in POR2, looking at precisely the same sales documents that are reviewed in POR3, it reached different conclusions. And the reason that it did that is because in POR2, it stated, for example, we quote this on page eight of our reply brief, that it was focused on whether the services were performed based on the terms of sale. The fact that there was separate revenue wasn't relevant. In POR3, it reached an opposite conclusion based on the same sales documents. So, you know, the facts didn't change. What changed was their interpretation of those facts through its definition of what service-related revenue was. Okay. This is Judge Reyna. Michael, where are we on time? Am I correct that Mr. Bond's time went out, including his rebuttal time? Yes, Your Honor. Mr. Bond's exceeded his time by about five minutes. Okay. Mr. Bond, I'll give you your two minutes rebuttal time when it comes, all right? So, let's hear from the other side members. Yes. Mr. Tudor, you're going to speak on behalf of the government for 12 minutes, and I understand that Mr. Liberta is going to speak for three minutes on behalf of A, B, and B. Is that correct? This is Mr. Tudor. That's my name. May it please the court. We respectfully request that the court affirm the decision of the Court of International Trade. The Court of International Trade sustained Commerce's remand results that applied total facts available with an adverse inference on the basis of three issues. One is the service-related revenue issue that the court was discussing with the Town's Council. Second was the incorrect reporting of a particular large power transformer part that was inconsistently reported in the home and U.S. market. Counselor, this is Judge Rayna. What is it that occurred in the third review that prompted Commerce to issue the supplemental questionnaires asking for specific information on the revenue stream related to the service? My understanding is there's two factors. One is the initial questionnaire in the third review was much more explicit than the one in the second review as to how the service-related revenues and expenses should be reported. The initial questionnaire in the third review made it explicit that those revenues and expenses should be reported in separate fields in a separate database and that all such expenses and revenues should be reported. Hyundai didn't do that. They, in their response, said, well, we're going to follow the same approach that we did in the second review. Commerce pointedly asked a more, I guess, pointed question in their third review questionnaire than they did in the second review. For context, in the second review, it was discovered only at verification that there were documents that suggested that the revenues were separately negotiable, had separate line items for them. It was only discovered at verification in the second review. In the third review, Commerce put the issue on the table right from the beginning. That's the first difference. Second difference is ABB did place documents on the record from the second review, those same documents, I believe, from the verification that showed that there were separate line items for things like freighter installation, had a separate price attached to them. Court of International Trade properly found that those were consistent with Commerce's definition of service-related revenues. We discussed that at pages 30 and 31 of our brief. The court can also refer to page 127 of the appendix at note 88 for the previous Commerce administrative determinations that had explained the basis for the capping methodology and the revenues. After that, Commerce sent a second questionnaire in July of 2016, again, asking Hyundai to fill out these specific revenue items such as freight and installation and to do so in separate fields. Hyundai, again, didn't do it. Commerce asked a third time, October of 2016, asking, again, with all of these fields, all these revenues and expenses in separate fields. Hyundai, in response to that, didn't do it in the manner that Commerce requested, submitted a worksheet showing that they had the information, they just didn't put it on the record before. Hyundai is essentially arguing that Commerce is prohibited from taking a harder look at an issue in a subsequent review because it didn't take as hard a look on the issue in the previous review. That's inconsistent with Commerce's discretion as the administering agency. The Court of International Trade also referred to this court's decision in Jackson & Brothers Fasteners Company, 822F3R1289 from 2014, shows a lot of different conclusions based on different facts in the record. Commerce explicitly asked for different facts in this case. Hyundai didn't want to give them to them when it tried to belatedly. That information was late and incomplete. Commerce was under no obligation to consider it given that it was late and cannot be verified. There should be no question that Commerce gave the appropriate notice required under 1677M subsection D. It gave two deficiencies very pointed to this issue. Hyundai's defense to that is not that Commerce was unclear in what it was saying or that what Commerce wanted. It's just Commerce shouldn't be able to ask for that because it didn't ask for that on the factual record of a prior review. Prior reviews are a separate factual record. Commerce decided to build the factual record in this one in part informed by the fact that it discovered these documents only at verification in the second review and didn't want to be in that position. It wanted to have all of the information on the record from the questionnaire and did so in two subsequent questionnaires. Hyundai's response... Mr. Tudor, you heard opposing counsel make what it viewed to be a strong argument that the definitions that the department was using or the conditions under which you had to separately report service changed from review number two to review number three. You heard that argument, correct? I heard that argument, Your Honor, and we disagree with it. Can you please tell us what the proper definition was and whether appendix 5121 reflects the definition? I was looking at 5121. So Hyundai appears to be citing Commerce's issues and decision memorandum in the second review. One, their citation amidst the previous sentence where it says that frankly there was no separate arrangements on behalf of the customer and where Hyundai had not sought reimbursement for that cost. Here, the court found that there were separate line items reflecting that these were separately negotiated with the customer and therefore Hyundai was seeking reimbursement for that cost. So that's inconsistent with what Hyundai even saying in its questionnaire response. As for what definition Commerce was using, again, we would refer the court to pages 30 and 31 of our brief, specifically note 7, their cite to previous Commerce determination. One quote from the circular welded carbon steel pipes from Thailand determination, although we will offset freight expenses with freight revenue where freight revenue earned by a respondent exceeds the freight charge incurred for the same type of activity, Commerce will cap freight revenue at the corresponding amount of freight charges incurred because it is inappropriate to increase gross unit selling price for subject merchandise as a result of profit earned on the sale of services, i.e. freight. Commerce was applying the same legal definition in both POR2 and POR3. In POR2, Commerce did not have information on the record or had not taken this until the verification stage that there were these separate line items on Hyundai's purchase order that then Commerce tried to make very explicit on the record in POR3 that this was what was going on and try to figure out exactly what those revenues were. As for the question as to whether there was any discussion of this issue, that is in the CIT case 16-54, which is on appeal to this court, I believe at 20-2114, and in the decision of the court in that case from February 19th of this year, which was ECF 178 in that case, the court did affirm Commerce's application of partial fact available to Hyundai because it discovered these submissions only at the verification stage. Here, Commerce made explicit on the record, tried to get the accurate information on this so that there was no confusion as to whether there were these revenues and what the amount was and what the amount of the expenses was, and Hyundai nevertheless did not provide the information until well after the response to the third questionnaire and then the information was laid in and complete. Therefore, Commerce's application of fact available with an average inference was reasonable given Hyundai's first refusal to do so, and then when it did provide the information, didn't provide it in the former manner that Commerce requested. Does that answer the court's question with respect to legal definitions as opposed to the course of dealings between Commerce and Hyundai in the two reviews? Do my colleagues have any questions? Okay, let's hear from Mr. Liberta. Thank you, Your Honor. Allen Liberta for ADB Mayors Visa Court. I'd also like to focus on Hyundai's detrimental reliance argument because it rests entirely on a mischaracterization of Commerce's alleged stated policy from the second administrative review to the point of where the definition of what service, how service-related revenues are to be treated. On this record, if the court would look at appendix page 127, which is the issues and decision memorandum in the third review, the second paragraph there, the Commerce Department explains that it didn't require separate service-related revenues in the second AR based on a factual determination that there were not separately invoiced or line item for those revenues. So, it was a mischaracterization. Mr. Liberta, but the record discloses that that factual assertion is incorrect, right? That's correct. They made an error. Yes. They missed in review two what they found in review three. That's correct. And as Mr. Toder pointed out, we appealed that and they corrected. They, in fact, took a voluntary remand in that case to fix what was a clear factual error. But the policy- How was the, this is Judge Reyna, how was that error discovered? Through verification? At verification, yeah, the verifier brought back a number of sales documents from verification. And we actually briefed in that case, look, there are verification documents that show that there were separate revenues for service. And we were pretty flabbergasted when the Commerce Department issued a determination that said those didn't exist. So, we did appeal. When we got to the third review, we brought those documents forward and said, look, they're here, please investigate this. And so, Commerce did. If the court looks at the citation that Mr. Baum provided to the second review IND memo, you'll see on page eight of their reply brief, there's a sort of a long quote from that IND memo that's full of ellipses. If you go to those ellipses, if you go to the actual determination and you read what was in the ellipses, quote, quote, and as they were not listed as a separate line item on the sales invoices or separately invoiced to the customers, we find no basis to indicate Hyundai sought to or obtained reimbursements for the expenses from the customers, end quote. So, this is essentially the statement both of their policy to require reporting where it's separately invoiced or line item and of what happened, their idea that there were no such invoices in the last. So, for Hyundai to take that and rely upon it as a basis, I mean, they are misstating the basis of the determination in the last review as the Commerce Department put in its IND memo in this review. And so, I don't see how their detrimental alliance argument can stand up. All right, Mr. Roberta, I think we've got that and you're out of time. Mr. Baum, we'll restore you back to your two minutes of rebuttal. Thank you, Your Honor. Two quick points. First, it's important, I think, in evaluating this reliance point to think about it in context, whether the Commerce Department intentionally looked at those documents and concluded that the standard that Hyundai was using, definition that Hyundai was using was correct or it made an error. In either case, at the time that Hyundai was preparing its responses, three times it had been told by the Commerce Department's was correct. Therefore, it was reasonable for Hyundai to continue following that approach. It wasn't until after the preliminary determination that the Commerce Department expressly said that it was considering a change. And at that point in time, Hyundai provided the requested worksheet with service-related revenue reported based solely on whether the revenue... But Commerce didn't ask for a worksheet, did it? No. Commerce asked for it to be put in a database when Hyundai submitted a worksheet with the information. That's true. Yes, but... Right. It didn't ask for a worksheet. It asked for the underlying documents and it asked for the information for you to separate the information from U.S. sales and to resubmit U.S. sales with the service revenue stream separated from that. The department made two separate requests, John. The first was for the data with respect to revenue that was separate based on services, which Hyundai provided in attachment 3S-46, which is in the appendix at 13258. That's what I'm talking about, right? That was a worksheet that you provided. Correct. That was requested. But the department also requested, as you just noted, the documents. So the Commerce Department requested all U.S. sales documents, which Hyundai provided about 3,300 pages of documents and the department did nothing with those. It simply claimed that it was out of time and didn't have time to think about the extent to which they supported what was in the worksheet that I just cited. Okay. Okay. Would you like to conclude? I would. I would simply conclude by saying, Your Honor, to the extent that became an issue because Congress didn't decide what service revenue meant and what it wanted until after the preliminary determination, the department had plenty of time left to review that worksheet that I cited as well as the documents to assess the extent to which that worksheet had useful information that could be used and to clarify any deficiencies that it thought existed, but it didn't do that. It just punted and claimed that it was out of time. Thank you, Your Honor. Okay. Thank you. That concludes this morning's argument. I thank the parties.